```
                   United States District Court
                     District of Massachusetts
```

```
_____
                              )
UNITED STATES OF AMERICA,     )
                              )
         v.                   )
                              )   Criminal No.
MELVIN McGREGOR,              )   07-10312-NMG
                              )
         Defendant.           )
_____)
```

## MEMORANDUM & ORDER

**GORTON, J.**

The defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress evidence discovered during the search of his car.

## I. Background

### A. Findings of Fact

Based on an evidentiary hearing that spanned two days, this Court makes the following findings of fact. The defendant, Melvin McGregor ("McGregor"), was arrested early in the morning of July 13, 2007. That morning, two police officers, Sergeant John Fitzgerald ("Fitzgerald") and then-Officer Brian Smigielski ("Smigielski," since promoted to Detective) had been monitoring the area surrounding Boston Medical Center, where a group of people had congregated near the emergency room after two shooting victims, both of whom later died, were admitted for treatment. Both victims were known to police as members of the Magnolia

-1-

Street Gang ("Magnolia Street"), a gang known to be associated with violence and drug trafficking.

At approximately 1:45 a.m. Fitzgerald and Smigielski observed two men arrive at the hospital in a silver car, approach the crowd assembled outside and, after about 20 seconds, depart with two other men, including the defendant.  The officers observed the four men walk briskly from the hospital and leave in a gray Honda Accord.  Two of the four occupants of the car, McGregor and Antonio Duncan ("Duncan") were suspected by the police of being members of Magnolia Street and close associates of the shooting victims.  Smigielski was aware that McGregor had been convicted of gun crimes in the past.

Fitzgerald and Smigielski followed the Accord in an unmarked vehicle as it drove away from the Boston Medical Center.  They contacted Officer Mark Freire, who was in a car equipped with emergency lights, and asked for assistance in making a vehicle stop.  While following the Accord, Fitzgerald and Smigielski observed two traffic infractions: 1) speeding (approximately 50 miles per hour in a 30 mile per hour zone) and 2) failing to stop at a flashing red light.

Upon instruction from Smigielski, Freire activated his emergency lights and stopped the vehicle.  As the officers approached the vehicle they noticed that some of the occupants appeared nervous.  All four occupants of the car were asked to

get out and were subjected to pat-frisks to ensure that they did not have weapons.  The interior of the automobile was "frisked" as well. The police presence at the traffic stop eventually grew to nine units comprising a total of 15 officers.  One of those officers, Scott O'Brien ("O'Brien"), had been trained in the detection of hidden compartments, or "hides," in motor vehicles.

During the course of his frisk of the car, O'Brien noticed a number of things which led him to believe that it contained a hidden compartment.  He first observed an "alarm magnet" below the car stereo, which he knew from his experience was frequently used to activate hides.  O'Brien called the magnet to the attention of Smigielski who proceeded to reach into the dashboard compartment and remove it.

After discovering the magnet O'Brien looked underneath the car and observed that the exhaust pipe had been modified in a suspicious manner.  He observed a piece of metal that was rusted more than the rest of the undercarriage and noticed substantial amounts of Bondo, a substance used for body work on cars.

He next crawled under the car, tapped a portion of the undercarriage with his flashlight and heard a hollow sound. Returning to the vehicle's interior, O'Brien noticed that the cup holders were not removable as he believed they typically are. Having concluded from his observations that the car likely had a "hide" for concealing contraband, he pried open an access panel

on the center console, through which he observed a handgun, some ammunition and some crack cocaine. Later testing revealed that the handgun bears at least one of the defendant's fingerprints.

McGregor was arrested and charged with felony possession of a handgun in violation of 18 U.S.C. § 922(g)(1). He now moves to suppress the evidence discovered in the hidden compartment, asserting that 1) the initial traffic stop was made without probable cause to believe that an infraction had occurred, 2) there was no justification for the frisk of the passenger compartment of the car and 3) even if there was justification, the search that was conducted exceeded the scope of a permissible frisk.

### B.   Procedural History

McGregor was indicted on September 19, 2007. On April 23, 2008, he filed a motion to suppress the evidence discovered during the car search. That motion is opposed by the government.

The Court conducted an evidentiary hearing on Thursday and Friday, August 14 and 15, 2008. Following that hearing the Court granted the defendants request to file a supplemental brief in support of his motion and indicated that it would permit the government to respond with a supplemental opposition. Both parties have since filed supplemental briefs.

## II.   Motion to Suppress (Docket No. 23)

In evaluating McGregor's motion to suppress, the Court

scrutinizes separately each step in the interaction between the police and the defendant. In that regard, it is necessary to identify the investigatory steps taken: a traffic stop, followed by a pat-frisk for weapons which then developed into a full-fledged search. With respect to each step the Court must determine whether the step was justified by the information known to officers' at that time. United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005).

> **A. The Initial Stop**
>
> **1. Legal Standard for a Traffic Stop**

The Fourth Amendment to the United States Constitution guarantees each citizen the right to be free from unreasonable searches and seizures. Police officers may, however, approach citizens and investigate potential criminal activity even without probable cause to make an arrest for the purposes of crime prevention and detection. Terry v. Ohio, 392 U.S. 1, 22 (1968). An officer may conduct a brief investigatory stop if he has "reasonable, articulable suspicion that criminal activity is afoot." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). Reasonable suspicion must be based on specific and articulable facts taken together with the rational inferences to be drawn from those facts. United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000). The government bears the burden of proving that a vehicle stop without a warrant is justified. United

States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006). A court must look at the totality of the circumstances in order to determine the reasonableness of the stop. United States v. Cortez, 449 U.S. 411, 417 (1981).

A traffic stop is generally reasonable if "the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Furthermore, the fact that a traffic violation operates merely as a pretext for stopping motorists about whom the police harbor unrelated suspicions is irrelevant to the Fourth Amendment analysis. Id. at 813 ("subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

### 2. Application

McGregor asserts that the traffic stop in this case was not based on reasonable suspicion because the officers had decided to stop the car even before any grounds for suspicion arose. Moreover, he alleges that the testimony of officers who purportedly observed traffic infractions is not credible.

Despite the defendant's protestations, this Court finds no reason to doubt the truthfulness of Officer Smigielski's testimony that he observed the defendant's car commit traffic infractions. His observations provided ample probable cause to believe that traffic violations had occurred. That those violations may have been a mere pretext for stopping a car whose

occupants were under suspicion does not negate the constitutionality of the stop. See Whren, 517 U.S. at 813.

### B. The Vehicle Frisk

As an initial matter, the Court notes that if the police had a reasonable belief that the defendant and the other passengers were armed, it was permissible to order them out of the vehicle during the traffic stop. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). In light of the double homicide earlier in the evening and the officers' observations in surveillance of the Boston Medical Center, they acted with reasonable caution in removing the occupants from the vehicle and pat-frisking them individually. The defendant did not resist those actions at the time and does not contest their permissibility now. The Court mentions them only briefly in order to complete the chronology.

#### 1. Legal Standard for Limited Vehicle Searches

Although the seminal pat-frisk case addressed only the frisking of a suspect's person, Terry, 392 U.S. at 6-7, its principles have been expanded to give the police the freedom to act in a manner reasonably necessary to protect their safety. With respect to traffic stops and vehicle searches, the Supreme Court has confirmed that given a Terry-like level of specific, reasonable suspicion about the dangerousness of suspects stopped in a vehicle, a search of the passenger compartment, "limited to those areas in which a weapon may be placed or hidden," is

permitted. Michigan v. Long, 463 U.S. 1032, 1049 (1983); United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002). The First Circuit Court of Appeals has interpreted Michigan v. Long to require 1) an actual suspicion that a suspect is armed and dangerous and 2) that the suspicion be objectively reasonable. United States v. Lott, 870 F.2d 778, 783-84 (1st Cir. 1989). Each evaluation of the reasonableness of the officers' conduct is to be made in light of the totality of the circumstances, i.e. "context is vital in determining the permissible scope of an investigative stop." Cook, 277 F.3d at 85.

### 2. Application

The totality of the circumstances surrounding the vehicle stop in this case demonstrate that the officers had an actual and reasonable suspicion that the passengers in the car might be dangerous. Those circumstances include the following facts:

1. the homicide earlier in the evening involving members of Magnolia Street;

2. the suspicious behavior observed at the hospital (two men arrive in one car, meet very briefly with two others and all leave together in another car);

3. two of the four men were believed to be members of Magnolia Street and associates of the homicide victims;

4. the "high speed and reckless driving" of the car;

5. three of the four men in the car were known to have been arrested for gun violations in the past; and

6. the "nervous" reaction of at least two of the passengers in the car.

The defendant contends that 1) mere movement or nervousness on the part of vehicle occupants is insufficient to justify a frisk, see McKoy, 428 F.3d at 41, 2) the traffic infractions observed provided no basis for reasonable suspicion justifying a frisk, see id. at 40, and 3) because so many officers were on the scene and the suspects were removed from the vehicle and well guarded, any actual concern for safety that might have been present had been alleviated by the time of the search of the vehicle.

The defendant's attempt to demonstrate that, in isolation, some of the factors identified by the government were insufficient to create reasonable suspicion ignores the clear mandate that courts look at the totality of the circumstances when evaluating the reasonableness of a stop. See, e.g., McKoy, 428 F.3d at 40. Although perceived nervousness and the character of the traffic infraction do not alone give rise to reasonable suspicion, the officer's knowledge about the contemporaneous events involving members of Magnolia Street, their belief that two occupants were members of that gang and their observations at the hospital constitute specific, particularized facts sufficient to support a reasonable suspicion that the defendants were armed and dangerous. A search of the car limited to the passenger compartment was, therefore, permissible. Long, 463 U.S. at 1049.

With respect to the officers concern for safety, the

exception sought by the defendant would swallow the rule set forth by the Supreme Court in Long permitting the search of the passenger compartment of a vehicle even where the suspect has been secured.  The police will always remove the suspect from a vehicle before searching it and, in that sense, any danger arising from the suspect's access to the vehicle's contents will necessarily be somewhat ameliorated.  Such danger would, of course, be renewed if the police were to send the suspects on their way without first searching the car.  See Long, 463 U.S. at 1051; United States v. Diaz, 519 F.3d 56, 62 (1st Cir. 2008).

    **C.**    **The Full Search**

        **1.**    **Legal Standard to Search a Vehicle**

As a general matter, a full search by law enforcement, as opposed to a mere "frisk" discussed above, is normally dependent on a search warrant.  U.S. Const. Amend. IV.  Due to their inherent mobility, however, automobiles fall within an exception to the general warrant requirement.  A warrantless search of an automobile by law enforcement officers is valid provided that there is "probable cause to believe that the [vehicle] contains contraband or other evidence of criminal activity."  United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992) (citation omitted).

        **2.**    **Application**

The government concedes that the search eventually carried

out by Officer O'Brien exceeded the scope of the initial Terry stop.  It contends, however, that his observations during the initial Terry-justified frisk of the vehicle provided him with probable cause to believe that the car contained "contraband or other evidence of criminal activity" and that the search was, therefore, constitutionally permissible.  See id.

O'Brien's investigation of the automobile began with a visual inspection of the interior and ended with the forcible removal of the center console to reveal a hidden compartment.  At some time between those two actions his conduct evolved from a "frisk," justified by reasonable suspicion, to a "search" requiring probable cause.  The parties disagree about when that occurred.

The defendant asserts that the officers' actions escalated to a full search the moment Officer Smigielski removed the alarm magnet from the vehicle's dashboard compartment.  At that time, the defendant contends, the officers did not reasonably believe that the magnet was a weapon or contraband and therefore its confiscation was a search that required probable cause.  All subsequent observations indicating the presence of a hide, he further argues, were derivative of that illegal search and thus cannot support a finding of probable cause.

A protective search must be limited to actions necessary for the discovery of weapons that pose a danger to law enforcement.

See Minnesota v. Dickerson, 508 U.S. 366, 373 (1993).  A hidden compartment, if one exists, is an area of the passenger cabin where a weapon could be hidden and easily retrieved by an occupant of the vehicle.  See Long, 463 U.S. at 1049. Consequently, steps taken by law enforcement to determine the presence of a hidden compartment are necessary for the discovery of weapons that could put officers at risk.

Here, the inspection of the alarm magnet was performed in furtherance of the officer's limited search to determine the presence of weapons.  See Dickerson, 508 U.S. at 373.  Officer O'Brien testified that he immediately recognized the object in the dashboard compartment as a house alarm magnet.  Through his training and experience he knew that such magnets were often used in connection with hidden compartments.  The object of the removal of the magnet and further inspection of the vehicle (including the undercarriage and cup holders) was to determine whether a hidden compartment was present.  See United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (noting that officer may shift focus of an investigative search if his suspicions mount during the course of the detention).

This Court is satisfied that the officers had probable cause to believe that a hidden compartment was present in McGregor's car based on the events leading up to the vehicle stop and Officer O'Brien's observations of 1) the alarm magnet, 2) the

altered exhaust pipe, 3) a panel, more rusted than the rest of the undercarriage that, when tapped, produced a hollow sound, 4) significant amounts of Bondo and 5) cup holders on the center console that were not removable.  The presence of a hidden compartment is not, however, itself a crime.  Probable cause to believe a hidden compartment was present must be considered together with the remaining circumstances of the stop to determine whether officers had probable cause to believe that the car contained contraband or evidence of a crime.  See United States v. Dickerson, 514 F.3d 60, 66 (1st Cir. 2008) (evidence of a hidden compartment is a factor in probable cause determination).

The probable cause standard is not a demanding one.  See Illinois v. Gates, 462 U.S. 213, 238 (1985) (defining probable cause as "a fair probability that the contraband" will be found).  Here, that standard was met based upon the same facts known to police that justified the initial stop plus the determination (based upon the factors discussed above) that the vehicle likely contained a hidden compartment.  The existence of probable cause justified conducting a full search of the automobile.  See McCoy, 977 F.2d at 710.  The prying open of the center console and the discovery of the firearm were conducted pursuant to that legal search and, consequently, exclusion is unwarranted.

**ORDER**

In accordance with the foregoing, defendant's motion to suppress (Docket No. 23) is **DENIED**.

**So ordered.**

                                               /s/ Nathaniel M. Gorton  
                                              Nathaniel M. Gorton  
                                              United States District Judge  
Dated December 17, 2008